STATE of Tennessee

v.

Charles Eddie HARTMAN.

Supreme Court of Tennessee,
at Nashville.

April 18, 2001.

Richard McGee and John G. Oliva, Nashville, TN, for the appellant, Charles Eddie Hartman.

Paul G. Summers, Attorney General & Reporter, Michael E. Moore, Solicitor General, Amy L. Tarkington, Deputy Attorney General, Joseph Baugh, District Attorney General, Art Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

DROWOTA, J., delivered the opinion of the court, in which ANDERSON, C.J., BIRCH, HOLDER, and BARKER, JJ., joined.

### I. Background

The appellant, Charles Eddie Hartman, was convicted in 1983 of the first degree murder in the perpetration of a kidnaping of sixteen-year-old Kathy Nishiyama. The jury imposed a sentence of death for the murder conviction. On the initial direct appeal, this Court affirmed both the conviction and sentence. See *State v. Hartman*, 703 S.W.2d 106 (Tenn.1985). Thereafter, Hartman filed a petition for post-conviction relief, and finding error in the sentencing hearing, this Court vacated the sentence of death and remanded for re-sentencing. See *Hartman v. State*, 896 S.W.2d 94 (Tenn.1995). The re-sentencing hearing occurred in 1997 with the prosecution again seeking the death penalty and relying upon the following three aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) the murder was committed while the defendant was in lawful custody, or in a place of lawful confinement, or during his escape from lawful custody, or from a place of lawful confinement. *See* Tenn.Code Ann. § 39-2404(i)(5), (6) and (8) (Supp.1980). Following a hearing at which both the prosecution and the defense offered proof, the jury imposed the death penalty upon finding that the prosecution had proven the three aggravating circumstances beyond a reasonable doubt and that the mitigating circumstances were not sufficiently substantial to outweigh the aggravating

circumstances so proven. *See* Tenn.Code Ann. § 39–2404(g) (Supp.1980). The Court of Criminal Appeals affirmed the sentence of death, and thereafter, the case was docketed in this Court. After a careful review of the record and the relevant legal authorities, we conclude that the trial court erred in refusing to allow the defendant to present evidence relevant to establish residual doubt as a mitigating circumstance and that the trial court erred in submitting aggravating circumstance (i)(6) to the jury, as the proof is not sufficient to support the aggravating circumstance. After carefully considering the record, we are unable to conclude that these errors are harmless beyond a reasonable doubt. Accordingly, the defendant's sentence of death is vacated, and the case is remanded for re-sentencing.

The proof introduced at this re-sentencing hearing showed that after school on November 16, 1981, sixteen-year-old Kathy Nishiyama left a note for her parents stating that she was going to visit her boyfriend, David Linn, and that she would be home by 10:00 p.m. Nishiyama lived with her parents on Charlemagne Street, near its intersection with Highway 41A in Clarksville in Montgomery County. Nishiyama arrived at Linn's house, stayed for awhile, and left to return to her own home between 8:00 and 8:30 p.m. She never returned home. Linn telephoned the Nishiyama residence about 9:30 p .m., and after two subsequent phone calls revealed that she had not arrived, Linn became concerned, left his residence, and began to search for her. He drove the route she would have taken to her home, and around 11:00 p.m., Linn discovered Nishiyama's car, a 1978 Ford Mustang, in the parking lot of a church on Lafayette Street, near

its intersection with Highway 41A. The church was located about one-half mile from the street on which Nishiyama lived. Linn testified that the car was locked, covered with dew, and that the muffler and engine were cold. Linn advised Nishiyama's parents of his discovery, and by midnight, her parents notified the Montgomery County Sheriff's Department that Nishiyama was missing.

Despite intensive search efforts, no clues about Nishiyama's disappearance were discovered until February 24, 1982, when a worker with the Tennessee Highway Department found her purse thirty feet down an embankment on Highway 49 in Houston County between Charlotte and Erin.[1] Although an extensive search was conducted, law enforcement officials found nothing further in that area.

One week to ten days later, residents of a trailer home located in a remote area near Highway 49 where Nishiyama's purse was found called the Houston County Sheriff's Department and asked that the Sheriff investigate something they had found in their yard. Further investigation revealed that the object was a human skull that was eventually identified as that of Kathy Nishiyama by Dr. Marvin Bass, Chairman of the Department of Anthropology at the University of Tennessee and forensic anthropologist for the State of Tennessee.

The surrounding area was carefully and thoroughly searched. Fragments of Nishiyama's skeleton and her clothing were found scattered in a wide area of remote woods along an old logging road about three miles from where her purse was found. Upper jaw bones and upper teeth

---

1. The victim's mother testified that because the purse and its contents were in such a good condition when found, she had doubted that the purse and its contents had been out-side in the elements from November of 1981 to February of 1982 and believed that it could have been thrown out beside the road shortly before it was discovered.

were found, and, using a dental chart and an x-ray of Nishiyama's skull, Dr. Bass was able to make a positive identification that these were the skeletal remains of Nishiyama. He testified that the victim had been hit in the mouth with a blunt object hard enough to break three teeth. The victim had also suffered a blow to her left eye that fractured her skull, another blow to the center of her head and a "massive" fatal blow to the right side of the head. This last blow caused her skull to cave in and also fractured the back of her skull. All of the injuries occurred at or near the time of death, but Dr. Bass could not determine exactly when the victim's death occurred. He opined that the victim had died approximately three to four months before her remains were found, and he noted that some of her bones exhibited evidence of dog tooth marks. Although Dr. Bass was unable to determine how long the victim had lived after receiving these injuries, the order in which the blows were inflicted, or how long the victim remained conscious, he opined that the massive blow to the right side of her head would have rendered her unconscious.

With respect to Nishiyama's clothing, the proof showed that her jeans were zipped and buttoned at the waist, but the fabric on the right side of the jeans had been cut through from the waistband to just above the ankle. Her panties had also been cut on the right side and a hole about one inch in diameter had been cut in the crotch of the panties. All cuts were consistent with having been made by a single-blade instrument like a knife. The left pant leg of the jeans was turned so that the inside of the fabric was facing out. Most of the victim's clothing and a portion of her remains were found near two trees that were about eight feet apart. Law enforcement authorities discovered scrapes on the trunks of both these trees which the Sheriff of Houston County, an experienced timbercutter and woodsman, said resembled marks that are made by a rope being tied around a tree.

At the time of the victim's disappearance in November of 1981, the defendant was serving a sentence for a criminal offense in the Dickson County Jail at Charlotte, where he had the status of trusty. Hartman performed maintenance work on the sheriff's department patrol cars and apparently performed other work for the sheriff and sheriff's deputies, particularly Deputy Carroll Fizer. Deputy Fizer was assigned patrol car number five. This car was described as a white 1978 Plymouth Fury, with a green stripe down the middle of the rear fenders, gold stars on the front doors, a full blue light bar across the roof, a heavy wire screen between the front seat and the back seat, and rear doors and windows that could not be opened from the inside. The proof also indicated that the Montgomery County Sheriff's Department had no Plymouth patrol cars at that time, that all of its patrol cars were Chevrolet Malibus, although they were also white with some green trim, similar to most county patrol cars in the State.

At approximately 6:00 p.m. on November 16, 1981, the night Nishiyama disappeared, Deputy Fizer and Hartman were working at a tobacco barn near Deputy Fizer's home. Deputy Fizer turned over custody of car number five to Hartman, instructing Hartman to drive the car back to the Dickson County jail. Hartman did not arrive at the jail until approximately 4 a.m. on November 17.

The proof showed that by turning on the patrol car's blue lights and pretending to be an officer, Hartman pulled over three automobiles in Montgomery County between 6:00 p.m. and 8:00 p.m. that night.[2]

---

2. In a statement taken after he returned to the Dickson County jail, the defendant admitted

The first stop occurred in the Palmyra area of Montgomery County at approximately 6:30 p.m. Richard Hughes was driving home from work on Highway 49 when he passed a patrol car that later followed him for approximately four miles. When Hughes turned off of Highway 49, the patrol car turned on its blue lights. Hughes stopped and was reaching for his license when Hartman told him that he did not need to see his license, that he only needed directions back to Dickson County.

The next stop occurred around 7:00 p.m. about six or seven miles from Clarksville on Highway 149. Terry Taylor stopped when he saw a police car with blue lights behind him. Taylor waited several minutes, got out of his vehicle, and walked back to the police car with his driver's license in his hand. Taylor said the driver of the police car was not wearing a police uniform and that his clothes looked like army-type work clothes. Upon seeing Taylor's license, Hartman told Taylor that he did not stop him for that reason, that he was from Dickson County, that he was on a "big drug bust," that he had driven to Montgomery County with a warrant to arrest a suspect, that he was lost and late, and that he needed directions to get back to Dickson County.

After Taylor gave Hartman directions as to where he should turn to get onto Highway 13 and then onto Highway 48 to Dickson County, they both proceeded down Highway 149 toward the intersection with Highway 13. Taylor stopped along the way to talk to a friend he saw outside. After five or ten minutes, Taylor continued on his way, but Taylor stopped again when he reached Hilltop Market and saw the patrol car sitting at the edge of the parking lot. Hartman asked Taylor if they were at the intersection where he should

turn, and Taylor responded that Hartman should turn right at the next intersection. Taylor said it was after 7:00 p.m. when they left Hilltop Market, that Hartman drove away first, and that when he reached the intersection where Hartman should have turned right to reach Dickson County, he looked in that direction but did not see the patrol car even though visibility allowed him to see for a long distance in that direction.

About forty-five minutes later, Taylor telephoned the Montgomery County Sheriff's Department and reported that he had been stopped by a patrol car driven by a person wearing regular street clothes, saying he was an officer from Dickson County who was lost. Taylor described the car and told the Montgomery County officer that he did not believe the driver was an officer and that he did not think the man should be making stops. A Montgomery County Sheriff's deputy confirmed receiving such a complaint about 8:30 p.m. and also confirmed that there were no Montgomery Sheriff's patrol cars making stops in that general vicinity.

Around 7:30 p.m., Betty Smith was driving from a baton competition at Austin Peay State University in Clarksville to her home in Palmyra on Highway 149. Smith needed to stop for gasoline, but she almost missed the service station and swerved in quickly without giving a turn signal. Noticing a patrol car sitting in a parking area near the service station, Smith feared she would be given a ticket for the quick, unsignaled turn. After pumping the gasoline, Smith left the service station without incident, but she noticed headlights behind her for eight or nine miles. About eleven miles from the service station, Smith saw blue lights behind her and pulled her to

---

stopping two cars driven by men. The defendant did not mention stopping a third vehicle

which was driven by a woman who was accompanied by her young daughter.

the road side. The man in the patrol car approached her car. She noticed that he was not wearing a uniform and that he had long, full hair. He shined his flashlight into Smith's car, particularly in the direction of her daughter. When Smith asked why she had been stopped, the man replied that her car matched the description of a vehicle that had been involved in a hit-and-run accident in front of the Golden Cue and that he had been told to follow her to see if she would flee.[3] The man took Smith's license back to the patrol car and remained there for sometime. Eventually, he returned Smith's license and allowed her to proceed home. About one month later, Smith and her daughter were watching a television newscast when they saw Hartman's picture and recognized him as the man that had stopped them.

Between 9:00 and 9:30 p.m. on the night the victim disappeared, Danny Bryant, an employee of the Trust service station on Riverside Drive in Clarksville, and Detective Roger Meckley of the Clarksville Police Department, observed an out-of-county patrol car heading north on Riverside Drive in Clarksville. They testified that the driver of the patrol car was a white male, with shoulder-length brown hair, wearing a green military-type jacket. About fifteen to thirty minutes later, between 9:15 and 9:45 p.m., Detective Meckley observed the same patrol car headed south on Riverside Drive toward the intersection of Highways 48 and 13. Detective Meckley did not see anyone in the back seat of the patrol car, although he was much closer to the vehicle than he had been when he saw it heading north and had been able to describe the race, hairstyle, and attire of the driver. When Detective Meckley received a dispatch around 11:00 p.m. about an out-of-county vehicle being in the area, he immediately notified the dispatcher that he had seen what he believed was that car earlier on Riverside Drive.

Around 9:30 p.m. Jackie Jackson left the Vacation Coffee House to return to his home located near the intersection of Lafayette Avenue and Highway 41A about fifteen minutes away. As he turned onto Lafayette Avenue, Jackson saw what he described as "a county patrol car" parked behind a car resembling the victim's vehicle in another church parking lot across the street from the church parking lot where the victim's car was later found. Jackson said that both cars were dark inside and unoccupied, but a white male, with shoulder length hair, wearing regular street clothes was standing between the two cars. Jackson could not remember the precise time he passed the church and saw the cars and the man, but he was certain that it was before 10:00 p.m. because he arrived home in time to see the 10:00 p.m. television newscast.[4] Dispatch records indicated that no Montgomery County patrol cars made a stop in that area around that time.

---

3. The proof showed that the Golden Cue was a pool and *video game room* located on Riverside Drive in Clarksville and that Hartman had frequented the Golden Cue for a time after it opened for business in 1980. Although the proof showed that the victim had also enjoyed spending time at the Golden Cue with her boyfriend, Linn testified that he and the victim did not begin *dating* until the spring of 1981, more than one year after Hartman had regularly patronized the establishment.

4. Jackson did not report what he had seen until three months later because he heard about the victim's disappearance the next day and assumed the patrol car had been investigating. Only when he learned that a trusty from Dickson County had been driving a county patrol car on the night of her disappearance did he report what he had seen.

Finally, Marvin and Barbara Rushing testified that they had been returning home from Nashville in mid-November 1981 between 1:00 and 2:00 a.m. when they saw a Dickson County Sheriff's patrol car driving onto the main state road from the logging road where the victim's remains were found. Marvin Rushing said he had noticed the patrol car because he was speeding and feared he would be given a ticket. Barbara Rushing confirmed this testimony. Although these witnesses lived in the area and knew when and where Nishiyama's remains were found, they did not come forward with this information until several years after the initial trial, when they learned that Hartman was seeking a new trial. When asked how he knew the patrol car was a Dickson County vehicle, Marvin Rushing said "I am an old country boy, you know as much as I went through Dickson County and as many times as I have seen Dickson County police and everything that's something you just know."

Sometime between 3:30 and 4:00 a.m. on November 17, 1981, Dickson County Sheriff Doyle Wall received a telephone call that Hartman had gone to the home of Officer Bill Lewis in Dickson. Officer Lewis was responsible for maintenance at the Dickson County jail. Officer Lewis and Hartman returned to the jail in Charlotte around 4:00 a.m. on November 17. Hartman was wet from the knees down. Two deputies observed a substance they believed was smeared blood on the right rear fender of the patrol car, and one of the deputies attempted to obtain a sample of the substance but was unable to do so. However, the officer in charge of investigating Hartman's activities said that he had not seen blood either on the inside or the outside of the patrol car and that the only substance on the outside of the patrol

car was red clay mud. Sheriff Wall also testified that he did not see any blood either on the inside or outside of the car. The car was not scientifically processed for evidence by the Tennessee Bureau of Investigation ("TBI") until March of 1982, and no evidence was discovered at that time.

About a week after his return to the jail, Hartman got a hair cut. In an interview with an assistant district attorney in December 1981, Hartman admitted stopping two cars in Montgomery County while he was driving the patrol car on November 16. He claimed that he had been lost and that he had returned late because the car "slid off" into a creek and he had been unable to quickly get the car out or obtain help. Hartman repeatedly denied both that he had driven into Clarksville and that he had stopped the victim's car.

The defense offered several witnesses at the re-sentencing hearing in an attempt to establish residual doubt as a mitigating circumstance. The first witness, Nancy Ann Perez, had been the victim's best friend. Consistent with a statement she had given to TBI agents at the time of the victim's disappearance, Perez testified that around 9:45 p.m. on the night of November 16, she was driving north on Highway 41A in Clarksville when she recognized the victim's car and license plate in front of her. Perez drove behind the victim's car until Highway 41A and Highway 79 divided. Perez followed Highway 79 and Nishiyama followed Highway 41A toward her home. Perez did not notice a police car that night. However, Perez noticed that a car which had previously followed her on Riverside Drive, strangely speeding up and slowing down, was behind Nishiyama when Highway 41A split from Highway 79.[5] Perez

5. The victim's mother had also testified on crossexamination that a month or so before

admitted that she had not actually seen the victim's face that night and that she later learned that another student at her high school lived in the same general area as the victim and drove a car the same make, model, and color as the victim's car. Perez was subpoenaed but was not called to testify at Hartman's initial trial.

The defense also called William Robert Rye who testified that between November 20 and 25, 1981, around 4:00 p.m. in the afternoon, he saw a woman resembling the victim about 150 yards away walking rapidly across a soybean field located in Montgomery County near the Houston and Dickson County lines in the area between Highways 149 and 13. Rye was looking through a rifle scope for deer at the time he saw her. Rye testified that the woman was about five feet, two inches tall and was wearing blue jeans and a long cream or white sweater, clothes very similar to those worn by the victim when she disappeared. When Rye last saw the woman, she stepped onto a log and walked away into a dense woods. Rye reported the incident immediately to the Montgomery County Police and told the police that he believed he may have seen the missing girl, but the police indicated that they could not immediately investigate because nightfall was approaching.

Rye went back to the log where he had last seen the woman and took a flashlight. He did not find the woman, but he observed footprints where the girl had stepped off the log and walked away into the woods. Rye was later shown a picture of the victim. Although he could not state that the woman he had seen was Nishiyama, he testified that she looked like Nishiyama and had the same color and length of hair as the victim. Rye admitted that he had also seen a jeep in the same general

vicinity at the same time that he saw the woman.

Another friend of the victim, Michael Bryant, testified for the defense that, on at least one or two other occasions prior to her disappearance, he had seen the victim's car parked in the church parking lot where it was discovered.

In addition to the residual doubt witnesses, the defendant also presented mitigation evidence relating to his character and personal history. Family members and friends testified that the defendant, who was born in 1958, had been a normal boy from a poor but loving two-parent family. The defendant's father apparently suffered emotional trauma from his service in the Korean War but was a good father nonetheless. The defendant had two brothers and a sister. His high school coach testified that he had been a leader and "tough competitor" on both the basketball and football teams.

The defense also offered proof to show that Hartman has one son and a stepdaughter, who described him as a good stepfather. Hartman obtained his GED in March of 1985, and Department of Correction employees testified that Hartman is a good prisoner and the best worker in the data plant at the prison, that he interacts well with other prisoners and guards, and that he was a good representative on the Inmate Council, particularly during the move to Riverbend Maximum Security Institution. Finally, a minister and a deacon from the prison ministry testified that the defendant was a committed Christian who had completed several Bible study courses. Hartman had specifically asked the minister to look after his son Shane.

Based upon this proof, the jury found the following three aggravating circum-

---

the victim disappeared, she had arrived home upset and frightened because a car had al-

most forced her off the road in the area where Highways 41A and 79 split.

stances: (1) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) the murder was committed by the defendant while he was in lawful custody or in a place of lawful confinement or during his escape from lawful custody or from a place of lawful confinement. *See* Tenn.Code Ann. § 39–2404(i)(5), (6), and (8) (Supp.1980).[6] Finding no mitigating circumstances sufficiently substantial to outweigh these aggravating circumstances, the jury imposed a sentence of death. *See* Tenn.Code Ann. § 39–2404(g) (Supp.1980).

On direct appeal to the Court of Criminal Appeals, the defendant alleged numerous errors, but the Court of Criminal Appeals rejected these claims and affirmed the defendant's sentence. Thereafter, pursuant to Tenn.Code Ann. § 39–13–206(a)(1),[7] the case was docketed in this Court.

The defendant raised numerous issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court entered an Order setting the cause for hearing and requesting oral argument on five issues. *See* Tenn.S.Ct.R. 12.[8]

For the reasons explained below, we conclude that the trial court erred by refusing to permit the defendant to present evidence relevant to establish residual doubt as a mitigating circumstance. In addition, we have determined that the evidence is insufficient to support one of the aggravating circumstances: "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." After carefully considering the record, we are unable to conclude that these errors are harmless beyond a reasonable doubt. Accordingly, the defendant's sentence is vacated, and the case is remanded to the trial court for re-sentencing. Below we discuss only those issues that are likely to be presented at the re-sentencing.

## II. King–Frazier Money Deal— Residual Doubt Mitigating Evidence

■ At the guilt phase of the original trial, the only witness who directly implicated the defendant in this crime was prison inmate Raven "Snake" Frazier who testified that the defendant had admitted to raping and killing the victim. *See Hartman*, 703 S.W.2d at 112–113. Subsequently, the defendant claimed that the State

---

**6.** The sentencing law in effect at the time the murder was committed is the applicable law. *See State v. Brimmer*, 876 S.W.2d 75, 82 (Tenn.1994).

**7.** "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

**8.** Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." (Emphasis in original.)

had hidden from the defense the fact that it had paid another inmate, Kenny King, money for Frazier's testimony. This issue was raised as a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in the defendant's post-conviction relief petition, and it was ultimately rejected by this Court. *See Hartman*, 896 S.W.2d at 101–102.

At the re-sentencing hearing, the State did not re-introduce Frazier's testimony about the defendant's confession or present any testimony by King. However, to establish the mitigating circumstance of residual doubt, the defendant sought to introduce proof regarding the payments to King and the benefits Frazier received for his testimony. The trial court refused to allow the defense to offer this proof, finding that evidence regarding the prosecution's "deal" with King and Frazier was not proper residual doubt proof. However, the defendant was allowed to make an offer of proof.

The offer of proof established that subsequent to the original trial, defense counsel discovered that certain prosecuting attorneys had conferred with defendant's cellmate Kenny King and agreed to pay King $1000, both to tape-record the defendant making statements about the charges that he was facing and to provide a witness to authenticate the recording. King had indicated that he would not testify under any circumstances, so prosecutors realized that the authenticating witness would be someone other than King, but they were not aware of the witness's identity. Because the tape-recorder malfunctioned, King was unable to record the defendant's statements; however, he provided the name of an authenticating witness—Raven "Snake" Frazier. Prosecutors did not discuss paying Frazier for his testimony because they admitted that supplying such a witness was "just part of the other [$1000]

deal." Frazier advised the prosecutors that he had heard the defendant make incriminating statements and agreed to testify. The $1,000 was deposited into King's prison account, with some of the money paid from the personal funds of certain prosecutors. One of the prosecutors had contacted the TBI before paying the money and was informed the money would be repaid by that agency. When asked if he had felt bound to pay Kenny King the $1000 even though he had provided no recording and only the testimony of Frazier, the former district attorney general replied: "Oh yeah—I felt—I had that obligation." The former district attorney general also admitted that he had agreed to write a letter on behalf of Frazier to the Board of Pardons and Paroles indicating Frazier's cooperation with the State in the defendant's case. None of this information was disclosed to Hartman's defense attorney prior to trial.

The trial court concluded that the proffered evidence was impeachment evidence relating to Frazier's testimony at the original trial. The court further noted that Frazier did not testify at the re-sentencing hearing and that this testimony would be relevant for the sole purpose of impeaching the first jury's verdict of guilt. The trial court disallowed its introduction, finding that the evidence did not relate to punishment.

The Court of Criminal Appeals rejected the defendant's claim that the trial court had erred in refusing to admit this proof, concluding that evidence at a re-sentencing hearing which would be admitted for the sole purpose of attacking the credibility of a witness's testimony at the original trial is not proper residual doubt testimony since it is not testimony that relates to the defendant's character or record or to the circumstances of the offense. While stating that it was arguably unfair that neither

jury heard this evidence, the Court of Criminal Appeals said that this was not the issue and that this issue was thoroughly litigated in the defendant's post-conviction proceeding.

Before this Court Hartman asserts that, because the evidence of the "deal" with Kenny King and Raven Frazier would have been admissible at the original trial on the issue of guilt, it is relevant to the existence of residual doubt and the issue of punishment and therefore should have been admitted at the re-sentencing hearing. He also notes that Tenn.Code Ann. § 39–2404(c) (Supp.1980)[now § 39–13–204(c) ] provides that the trial court at a capital sentencing hearing may admit any evidence that the court deems relevant to punishment and that such evidence extends beyond the nature and circumstances of the crime and the defendant's character.[9] He also says that this Court's opinion in *State v. Teague*, 897 S.W.2d 248, 256 (Tenn.1995), fully supports his argument that any evidence admissible at the prior trial should be admissible at re-sentencing. Hartman urges that such evidence was crucial in this case given the prosecutor's repeated argument that the jury was required to give the finding of guilt "full faith and credit." Under these circumstances, Hartman argues that the trial court's refusal to admit this proof effectively denied him any opportunity to demonstrate that the verdict is not beyond all doubt, and that, in fact, doubt exists about the prior jury's finding of guilt.

The State responds that any evidence that money was paid to Kenny King is not residual doubt evidence because it is not relevant to the circumstances of the crime or the aggravating or mitigating circumstances but only to prosecution efforts to investigate the crime. The State also says that the fact that the prosecutor consistently asked the jury to give full faith and credit to the prior verdict does not allow the defendant to impeach the original verdict because, under *Teague*, the validity of the conviction is not an issue at a re-sentencing hearing. Finally, the State says that the "money evidence" was properly excluded because the re-sentencing jury did not hear Frazier's testimony about Hartman's confession. Accordingly, the State asserts that "a defendant cannot rebut something that is not presented."

■ A capital sentencing jury may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any other circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *See Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The United States Supreme Court has held that there is no constitutional right to have residual doubt considered as a mitigating factor in a capital sentencing hearing. *See Franklin v. Lynaugh*, 487 U.S. 164, 174, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988). However, just six years ago this Court, in a unanimous decision, held that Tennessee law requires that a defendant be allowed to present evidence at a re-sentencing hearing to establish residual doubt as a nonstatutory mitigating circumstance. *See State v. Teague*, 897 S.W.2d

---

9. Tenn.Code Ann. § 39–2404(c) (Supp.1980) provided in pertinent part: "In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors."

248, 256 (1995) (*Teague IV* ). In so holding we stated:

> The defendant's legal argument, that in this case he is entitled to present "any exculpatory evidence of which [the State] was aware relating to the defendant's role in or noninvolvement in the killing of [the victim]" is supported by the facts of this case as well as the statute and the Tennessee and federal decisions discussed above. Those cases dealt with evidence that had been presented to the jury in the prior trial or evidence that was consistent with the defendant's plea in the prior trial. In none of the cases in which the evidence was held to be admissible in the resentencing hearing did the defendant take a position regarding the circumstances of the crime inconsistent in legal principle with that taken at the prior trial. As stated previously, the exact nature of the evidence which the State refused to disclose does not appear in the record. However, the order entered by the trial court applies to "any exculpatory evidence ... relating to the defendant's role in or noninvolvement in the killing of [the victim]." Under the terms of that order, the defendant would be entitled to present evidence regarding the circumstances of the crime, even if one of those circumstances was that the defendant was not a participant. Any evidence within that definition would be consistent with the position taken by the defendant throughout these proceedings. He has consistently maintained that he is not guilty of first degree murder, the offense charged. He insisted on direct appeal in *Teague I* that the evidence was not sufficient to support the verdict and that the State withheld evidence of a "deal" with Skinner for his incriminating testimony. On appeal to the Court of Criminal Appeals in *Teague III,* the defendant asserted

his innocence of the offense charged and claimed that his conviction was procured by fraud and misrepresentation.

To the extent that the nature of evidence held by the State appears in this record, such evidence conforms to the indictment, the defendant's plea and the rules of evidence and, therefore, *it would have been admissible at the sentencing hearings in the original trial.*

Both the statute and prior case law dictate that the defendant has the right to present at the sentencing hearing, whether by the jury which heard the guilt phase or by a jury on re-sentencing, evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate his culpability. *Evidence otherwise admissible under the pleadings and applicable rules of evidence, is not rendered inadmissible because it may show that the defendant did not kill the victim, so long as it is probative on the issue of the defendant's punishment.*

*Teague IV,* 897 S.W.2d at 256 (emphasis added) (internal citations and footnotes omitted).

Applying the rule announced in *Teague IV,* we conclude that the trial court erred in refusing to admit the defendant's proffered evidence of residual doubt. Like Teague, the defendant in this case has consistently maintained his innocence and claimed that he is not guilty of first degree murder. He has insisted both on direct appeal and in a post-conviction action that the State withheld relevant impeachment evidence about a deal it had struck to obtain the incriminating testimony of Frazier. Therefore, as in *Teague IV,* the evidence Hartman sought to introduce unquestionably conforms to the indictment, the defendant's plea and the rules of evidence, and therefore, it would have been

admissible at the original trial. *See Teague IV*, 897 S.W.2d at 256.

 Based upon some of the language in *Teague IV*,[10] the trial court understandably attempted to draw a distinction between evidence that does nothing more than impeach the verdict of the original jury and evidence that directly mitigates culpability by showing that the defendant was not involved in the crime. However, given the constitutional directive that capital sentencing juries not be precluded from considering mitigating circumstances, we decline to adopt an unworkable rule that would require trial courts to engage in intellectual hairsplitting with respect to what is and is not admissible mitigating evidence. By definition, residual doubt is established by proof that casts doubt on the defendant's guilt. It is not limited to proof that mitigates the defendant's culpability for the crime.

While we agree with the trial court and the Court of Criminal Appeals that not all impeachment proof will be relevant to show residual doubt, it does not logically follow that impeachment proof will never be relevant to establish residual doubt about the defendant's guilt. Where, as here, the proffered residual doubt proof is impeachment of the testimony of the only witness who offered direct rather than circumstantial proof of the defendant's involvement in the crime, such proof clearly is relevant and admissible to establish residual doubt as a mitigating circumstance. Although we did not explicitly address the admissibility of such evidence in *Teague IV*, we certainly implied that it was relevant and admissible when we referred to the alleged withheld evidence of a " 'deal' with Skinner for his incriminating testimo-

ny" when discussing the evidence that Teague maintained established his innocence. *See Teague IV*, 897 S.W.2d at 256.

 In holding that the trial court erred, we reject the State's assertion that the proffered evidence was not admissible because Frazier did not testify at the re-sentencing hearing and therefore the defendant "cannot rebut something that is not presented." The simple and obvious answer is that the defendant was not offering the evidence in rebuttal. Instead, the defendant was offering the evidence to *establish* a mitigating circumstance—residual doubt. Since Frazier testified before the jury that determined the defendant's guilt, evidence that impeached his testimony was relevant and admissible to establish residual doubt about the defendant's guilt. We also reject the State's argument that this issue was litigated in Hartman's prior post-conviction action that eventually was considered by this Court. While the same course of events was considered in the post-conviction action to determine whether the defendant's rights under either *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) or *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) were violated, the discussion of those issues has no bearing upon whether this proof is relevant and admissible to establish residual doubt as a mitigating circumstance. The residual doubt question at issue in this appeal was presented for the first time only after this Court reversed the defendant's sentence of death and remanded for a re-sentencing hearing. In fact, as a general rule, only in re-sentencing hearings will trial courts be faced with determining what evidence is relevant and ad-

---

**10.** *See Teague IV*, 897 S.W.2d at 252 (stating that evidence is admissible if it relates to the circumstances of the offense, any aggravating or mitigating circumstances, "including evi-

dence which may mitigate a defendant's culpability by showing that he actually did not kill the victim").

missible to establish residual doubt as a mitigating circumstance because, when the same jury determines guilt and innocence such evidence will have been properly admitted at the guilt phase of the trial. While trial courts have the discretion to control the introduction of such proof to avoid undue delay, or the needless presentation of cumulative evidence,[11] doubts about the admissibility of reliable proof relevant to show residual doubt should be resolved in favor of admissibility. The trial court erred by refusing to allow the defendant to offer impeachment evidence to establish residual doubt at this re-sentencing hearing.

### III. Sufficiency of Evidence— Aggravating Circumstance (i)(6)

█ In addition to the erroneous exclusion of relevant mitigating evidence, we have also determined that the evidence in this case is insufficient to establish one of the aggravating circumstances, "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant."

During closing argument the State asserted that Hartman had committed the murder because the victim would have been able to identify him and report him for the kidnaping. The jury found this aggravating circumstance, and the Court of Criminal Appeals held that, viewing the evidence and the fact that the victim would have been able to report both her kidnaping and the unlawful use of the patrol car, the jury could reasonably infer that one purpose of the murder was to prevent the victim's identification of the defendant.

The defendant argues that the proof is insufficient to support this aggravating circumstance. We agree. The relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *See State v. Nesbit,* 978 S.W.2d 872, 887 (Tenn.1998); *State v. Cazes,* 875 S.W.2d 253 (Tenn.1994).

While it may be plausible to believe that one of the defendant's motives in committing the murder was to avoid arrest for the kidnaping, such a belief is not supported by any particular proof in the record. The State's proof on this issue was purely speculative, and the evidence in this record is simply insufficient to establish that any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *See State v. Branam,* 855 S.W.2d 563 (Tenn.1993) (holding the evidence insufficient to establish this aggravating circumstance).

█ In concluding that the evidence is insufficient, we do not depart from prior decisions which have held that this aggravating circumstance may be applied when the proof shows that avoiding arrest was one motivation for the killing. As we have previously held, application of this aggravating circumstance is not limited to only those killings which are solely or predominantly motivated by a desire to avoid arrest or prosecution. *See State v. Bush,* 942 S.W.2d 489, 504–05 (Tenn.1997). However, we emphasize that there must be sufficient proof to establish that avoiding arrest or prosecution was a motivation for the killing. The evidence in this record is simply insufficient in this regard.[12]

---

11. *Cf.* Tenn.R.Evid. 403.

12. This aggravating circumstance was not relied upon by the State at the original trial as a ground supporting imposition of the death penalty.

■ Accordingly, having determined that the trial court both erroneously excluded evidence relevant to establish residual doubt as a mitigating circumstance and erroneously permitted the jury to consider an aggravating circumstance which was not supported by sufficient evidence, we must next determine whether these errors are harmless beyond a reasonable doubt.

With respect to the erroneously excluded mitigation evidence, the record shows that the clear defense strategy at this re-sentencing hearing was to establish residual doubt in the minds of the jurors.[13] This strategy was evident during opening statements when defense counsel told the jury that the defense would present proof about how the State paid money to procure the testimony of a prison inmate, the only witness to directly implicate the defendant. The defense strategy was obvious throughout cross-examination of the State's witnesses. This strategy also was consistently followed during the presentation of the defense proof. Specifically, the defense called witnesses who testified that they had seen the victim alive after the time the State believed she had been abducted and murdered by the defendant. Considered in context, there is no doubt that the proof excluded by the trial judge was the cornerstone of the defense theory of mitigation at this re-sentencing hearing.

Moreover, as the defendant points out, recent studies have shown that in general residual doubt is one of the most compelling mitigating circumstances a capital defendant can establish to improve his chances of receiving a life sentence. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum.L.Rev. 1538, 1563 (1998); William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases*, 15 Am.J.Crim .L. 1, 28 (1988) ("The existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor in the life recommendation cases studied.").

■ However, the most important factor for our purpose in determining whether these errors were harmless is that these errors directly impacted the jury's sentencing decision to the defendant's disadvantage. The jury was allowed to consider an aggravating circumstance not supported by sufficient proof and was precluded from considering relevant mitigating proof crucial to the theory of defense. While the proof in this record is sufficient to support the two remaining aggravating circumstances, it is not overwhelming.[13] And given that the jury de-

---

**13.** This theory of defense is consistent with the original Tennessee Supreme Court Rule 12 Report in which the original trial judge indicated that the evidence did not foreclose all doubt respecting Hartman's guilt.

**13.** With respect to the (i)(5) aggravating circumstance, the proof is not definitive as to whether the victim was conscious during the time she sustained trauma to her head. The State's position is that the location of the broken teeth near the logging road indicated that the victim was struck at least once before she was rendered unconscious farther in the woods by the extremely forceful blow to the right side of her head. This position is some-

what weakened, however, by the proof that the victim's remains had been disturbed and scattered by animals. The State also asserts that the victim suffered mental torture because, even though she allegedly was tricked into joining Hartman in the patrol car, at some point during the lengthy drive from her car to the place of her murder she no doubt realized that she had been tricked and became terrified by her situation. Accordingly, although not overwhelming, the proof of the (i)(5) aggravating circumstance is sufficient. Likewise, the proof is sufficient to support the (i)(8) aggravating circumstance. The proof shows that, at the time this murder was committed, the defendant should have been at the

liberated for approximately eight hours before reaching a sentencing verdict despite these errors, we are unable to conclude that the verdict would have been the same had these errors not occurred. Accordingly, the defendant's sentence of death is vacated and the case remanded for re-sentencing. Issues not likely to reoccur have been pretermitted,[14] but in the interest of judicial economy, we will address two issues that may be presented at any re-sentencing hearing.

## IV. Polygraph Results—Residual Doubt Mitigating Evidence

The defendant claims that the trial court erred in refusing to permit into evidence to establish residual doubt the results of two polygraph examinations he had taken which he claims shows his innocence. Apparently recognizing that polygraph results are generally not admissible proof, the defendant argues that the rules of evidence cannot be applied in a mechanistic manner so as to infringe a defendant's constitutional right to present mitigating evidence at a capital sentencing procedure. The State responds that evidence that Hartman allegedly passed polygraph tests is not admissible because its lack of any indicia of reliability means it is not probative. We agree.

The defendant is correct that the rules of evidence should not be strictly applied in capital sentencing hearings to preclude the admission of relevant evidence.[15] However, as the Court of Criminal Appeals recognized, there is longstanding precedent in this State holding that polygraph test results are inherently unreliable, and consequently, such results are irrelevant and inadmissible. *See Grant v. State*, 213 Tenn. 440, 443, 374 S.W.2d 391 (1964); *Irick v. State*, 973 S.W.2d 643, 652–53 (Tenn.Crim.App.1998); *State v. Campbell*, 904 S.W.2d 608, 614 (Tenn.Crim.App. 1995); *State v. Adkins*, 710 S.W.2d 525, 529 (Tenn.Crim.App.1985).[16] We agree with this precedent. Moreover, contrary to the defendant's assertion, no different rule is required when a defendant seeks to admit polygraph test results to establish residual doubt. Since such results are inherently unreliable and not admissible to establish the defendant's guilt, it follows that such results are not admissible to establish residual doubt about the defendant's guilt. Accordingly, the trial court

---

Dickson County jail, that he was driving a Dickson County Sheriff's patrol car without authorization, that he used the car to stop the victim, and that the Dickson County's Sheriff's Department was actively searching for the defendant. This proof is sufficient to establish that the murder was committed during the defendant's escape from lawful custody. *See State v. Hall*, 976 S.W.2d 121, 134 (Tenn. 1998).

14. Although we find it unnecessary to address this issue in depth, we agree with the Court of Criminal Appeals that the prosecutor erred during closing argument by referring to (1) his own status as a father; (2) the defendant as a "predator, it's like a lion waiting at a water hole for a helpless victim"; and (3) his own military experience and the need for general deterrence. Having pointed out these errors, we are confident that the prosecution will be careful not to repeat them.

15. *See State v. Sims*, —— S.W.3d ——, ——, 2001 WL 378686 (Tenn.2001).

16. Several other states have also held that polygraph evidence is not admissible at a capital sentencing hearing. *See, e.g., Ex parte Hinton*, 548 So.2d 562, 569 (Ala.1989); *People v. Dunlap*, 975 P.2d 723, 755–757 (Colo. 1999) (*en banc* ); *People v. Jefferson*, 184 Ill.2d 486, 235 Ill.Dec. 443, 705 N.E.2d 56, 60 (1998); *State v. Hall*, 955 S.W.2d 198, 207 (Mo.1997); *cf. United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413 (1998) (holding that a per se evidentiary rule excluding polygraph evidence did not violate defendant's right to present a defense under the Fifth and Sixth Amendments).

did not err in refusing to admit the results into evidence.

### V. Redaction of Statement

 The defendant also complains about the trial court's refusal to admit those portions of his statement reflecting his offers to take polygraph tests. One of the prosecutors read a portion of a statement given by the defendant at the time of the original investigation in which he admitted stopping two men in Montgomery County the night of the victim's disappearance, but denied going into Clarksville or stopping the victim. The trial court did not allow the prosecutor to read those portions of the same statement reflecting the defendant's repeated offers to take a polygraph test.

Before this Court, the defendant asserts that this redaction violated his due process right under *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), to deny or explain the evidence relied on by the State. Hartman also argues that the redaction violates Tenn. R. Evid. 106, which sets out the "rule of completeness" and provides that

> [w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

*See generally* Cohen, Sheppeard & Paine, *Tennessee Law of Evidence,* § 106.1–106.3 (3d ed.1995).

The State responds that the trial court and the Court of Criminal Appeals properly rejected the defendant's contention because redacting the defendant's statement to remove his offers to take a polygraph test did not frustrate the purpose of Rule 106. We agree that the trial court and Court of Criminal Appeals did not err.

Initially we note that the rules of evidence do not strictly apply to capital sentencing hearings. *See Sims,* —— S.W.3d at ——, 2001 WL 378686. Nonetheless, we conclude that redacting the defendant's statement did not offend either the fairness concerns of Rule 106 or the due process concerns of *Gardner.*

 As we recently discussed in *State v. Keough,* 18 S.W.3d 175, 182 (Tenn.2000), Rule 106 is designed to ensure "that the trier of fact be permitted to assess related information without being misled by hearing only certain portions of evidence." As the trial court found, the defendant's statement was not distorted by redacting his offers to take a polygraph test. Those portions of the statement were *at most* cumulative of the defendant's statements denying involvement in the crime which were read into evidence by the prosecutor. None of the unfairness concerns which Rule 106 is designed to alleviate were present in this case. For the same reasons, the defendant was not deprived of his due process right to deny or explain the evidence. Again, the redacted statement presented to the jury included the defendant's assertions that he had nothing to do with this crime. In no way did the redaction deprive the defendant of his due process right to explain or deny the proof since his denials were included in the redacted statement that was read to the jury.

In addition, as previously stated, polygraph results are inherently unreliable and inadmissible. For the same reasons, a defendant's offer to take a polygraph test is inadmissible. *See, e.g., Adkins,* 710 S.W.2d at 528–529 (holding that a trial court did not err by refusing to permit a defendant to introduce into evidence the portions of a statement he gave an officer in which he said he was willing to take a

**62**

polygraph test). Therefore, we conclude that the trial court did not err in refusing to admit those portions of the defendant's statement reflecting his offers to take a polygraph test.

### VI. Conclusion

We conclude that the trial court erred in refusing to allow the defendant to present evidence relevant to establish residual doubt as a mitigating circumstance and in submitting to the jury an aggravating circumstance not supported by sufficient proof. After carefully considering the record, we are unable to conclude that these errors were harmless beyond a reasonable doubt. Accordingly, the defendant's sentence of death is vacated, and the case is remanded for re-sentencing. Costs of this appeal are taxed against the State of Tennessee for which execution may issue if necessary.