# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
July 12, 2011 Session

## CLARENCE NESBIT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P-21818     Chris Craft, Judge**

**No. W2009-02101-CCA-R3-PD  -  Filed March 28, 2013**

JOSEPH M. TIPTON, P.J., dissenting.

I respectfully disagree with the majority's conclusion that the numerous deficiencies in counsel's performance failed to prejudice the Petitioner cumulatively in his right to a fair proceeding and failed to call into question the reliability of the jury's verdict. I agree with the majority's conclusions regarding counsel's deficiencies except its conclusion that counsel were not deficient in their pretrial investigation and trial preparation. The majority concludes that because the trial began one year and seven months after the Petitioner was indicted, counsel "would not have had time or resources to conduct the investigation performed by post-conviction counsel after the trial." Although the majority is correct in noting the length of time it took for all the relevant witnesses to be found and presented at the post-conviction hearing, I simply cannot agree that counsel did not have adequate time to investigate and prepare for the trial. Although it took an extended amount of time to locate and present several of the witnesses at the post-conviction hearing, these witnesses were readily available and in the Memphis area at the time of the shooting and the trial, many of whom lived at Pershing Park Apartments where the killing occurred. No evidence was presented at the post-conviction hearing that it would have taken trial counsel months or years to locate the relevant witnesses before the trial.

Counsel failed to interview Miriam Cannon, the victim's sister, who, along with Valencia Miller, saw the victim and the Petitioner together approximately two hours before the shooting. Counsel admitted that he learned this information when the victim's sister testified at the trial. The victim's sister testified that she visited the victim at 1:00 p.m. the day of the shooting, that the victim opened her apartment door, and that she noticed a horizontal burn on the victim's neck. She saw the victim's children on the sofa with the Petitioner, but no evidence was presented that she saw the victim's children crying or upset. By investigating and interviewing Ms. Cannon and Ms. Miller, counsel could have presented

evidence of the improbability that a woman who had endured burns and been beaten on the bottom of her feet was capable of walking to the door to greet her sister. Moreover, counsel could have used the sister's testimony to show that the victim's young children would have been upset had the victim been subjected to torture. Likewise, the victim's asking her sister to return at 3:00 p.m. would have helped to refute the torture allegation. Although Ms. Cannon testified for the State and counsel had notice of her testifying, counsel stated he did not know that she or Ms. Miller saw the victim and the Petitioner two hours before the shooting.

Jail visitation records from 1993 to 1995 did not reflect any visits by Ms. Glenn, Ms. Benson, and co-counsel. The records show that trial counsel visited the Petitioner four times, one of which was to discuss the twenty-five-year plea offer. I believe that counsel's failure to convey the offer diligently to the Petitioner is also telling of counsel's overall deficient performance. Counsel had approximately two months to convey the offer but only did so the day before it expired because, in part, of his case load and the holiday season. Likewise, counsel spent a mere fifteen minutes discussing and explaining the offer to the Petitioner, although the Petitioner's IQ was seventy-four, placing him in the "borderline range" of having an intellectual disability. Dr. Auble stated that the Petitioner's deficits were relatively pervasive and easily detected. I note that although the majority concludes that no credible evidence was presented that the Petitioner would have accepted the plea offer if counsel had presented it diligently, evidence was presented that the Petitioner wanted to accept the offer about one month after it was conveyed to him. The trial court did not discredit Annette Jones's testimony that the Petitioner wanted to accept the offer around the time of the ice storm, which occurred in February 1994.

I conclude that no evidence exists to show that counsel or the defense team investigated the facts of this case outside of the State's discovery materials before the trial. Although I appreciate counsel's reliance on the client for potential witnesses, that reliance alone does not always suffice, especially when there appears to be a lack of communication between counsel and his client. Ms. Glenn, the defense team's legal investigator at the trial, testified that she did not canvas Pershing Park Apartments for witnesses who were home at the time of the shooting, who knew the victim or the Petitioner, or who knew about their relationship. She also did not attempt to obtain tenant records, which were available from the apartment complex's management company until 1998. There was ample time to perform this investigation. She said she only interviewed the witnesses listed on the indictment or people discovered from those witnesses. Counsel also did not know that Koete Brown was at the victim's apartment the day before the shooting with the Petitioner and saw that the victim was not afraid of the Petitioner. Although Mr. Brown was incarcerated at the time of the post-conviction hearing, there is no evidence that his credibility was an issue at the time of the shooting or the trial.

2

Ms. Geiser, the legal investigator for the post-conviction team, located Quinton and Kareem Curry, who saw the Petitioner and the victim the morning of the shooting. Although the trial court discredited Quinton's testimony based on his intellectual disability and found that his testimony conflicted with other testimony presented at the trial, the court did not discredit Kareem's testimony. Kareem saw the victim and the Petitioner around 11:00 a.m. or noon the day of the shooting and said that although he did not know they were romantically involved, their body language gave him the impression that they were dating. Likewise, Bernice Nesbit, who was not related to the Petitioner, heard a loud noise before 12:00 p.m., which corroborated testimony that Quinton fired the gun and that Mr. Shaw saw Quinton hand the gun to the Petitioner around the same time.

Although mitigation evidence was mostly relevant to sentencing, the lack of investigation and preparation of mitigation witnesses reinforces my conclusion that counsel failed to investigate and prepare for the guilt phase of the trial. Ms. Benson testified that her records did not show she interviewed many members of the Petitioner's family or obtained his special education records. Although the Petitioner told Ms. Benson that he attended Christ Baptist Church, her records did not show her interviewing the pastor or members of the church. Ms. Benson knew of the Petitioner's religious practices, but counsel testified that the Petitioner did not tell him about his church or pastor. Ms. Shettles, though, located the Petitioner's medical records from age four and special education records and found many witnesses, including Ms. Davis, who the defense claimed could not be located before the trial.

Although the Petitioner's IQ and mental capacity were mostly relevant for sentencing, Judge Ward and Mr. Massey testified that because the Petitioner's theory of the case was mistake of fact or ignorance, counsel would have been permitted to present testimony at the trial about the Petitioner's IQ, special education records, and mental health. I agree with the trial court's finding that Dr. Auble did not testify that the Petitioner had a diminished capacity, but I conclude that her testimony established an alternative explanation for the Petitioner's behavior before and after the shooting. Although the Petitioner did not have a mental disease or defect that precluded him from forming the requisite intent, his "borderline" IQ and learning disabilities explained his behavior and lent credence to the accidental shooting defense. I note, too, that although counsel did not think the Petitioner suffered from mental disabilities, Dr. Auble testified that the Petitioner's IQ was seventy-four and that the Petitioner's "deficit" was "relatively pervasive" and easily detected by interacting with him. She said that it would have been clear to anyone spending time and working with the Petitioner that something was not right and that investigation was needed.

With regard to the torture allegation, the State's basis for premeditation, the police report showed that an unlit cigarette was found near the victim's left hand and an unused

match found near her right hand. The record shows that the victim was right-handed. Although counsel agreed that this was consistent with a person's preparing to light a cigarette and that the victim would not have been allowed to smoke a cigarette if she were being tortured, counsel stated this evidence could have backfired if the jury thought the victim did not smoke. The evidence shows, though, that there were witnesses who were available at the time of the trial and testified at the post-conviction hearing about the victim's smoking. Ms. Davis, the victim's best friend and neighbor, testified that the victim smoked cigarettes. Ms. Geiser also testified that the victim's medical records showed that the victim smoked cigarettes. A decision not to act is only protected when it is informed after adequate investigation. *See Strickland v. Washington*, 466 U.S. 668 (1984); *Timothy Terell McKinney v. State*, W2006-02132-CCA-R3-PD, slip op. at 37 (Tenn. Crim. App. Mar. 9, 2010). Counsel admitted that he did not ask witnesses who testified at the trial, or those who did not testify, if the victim smoked cigarettes and that the information would have been helpful.

Counsel did not interview witnesses who knew about the victim's wearing shoes that were too small for her feet that caused her feet to hang off the back of her shoes. Counsel admitted that the information could have been used to refute the State's allegations of torture and that he would have presented the witnesses at the trial. Ms. Davis testified that the victim wore Aigner "mule-like" shoes that were too small and that the victim "could walk on glass with those feet." Moreover, there is no evidence that the Petitioner had a history of violence. Although the term falanga was not used during the guilt phase of the trial, Dr. Smith discussed the nature and location of the victim's injuries. Mr. Massey and Dr. Hudson agreed that it was highly unlikely that a "sophisticated" form of Turkish torture was used by a nineteen-year-old man from Memphis's inner city with limited education, a low IQ, and no history of violence. Dr. Hudson had never seen falanga in the Southeastern United States in his eighteen-year tenure as a medical examiner. I note that no restraint marks were found on the victim.

With regard to Fred Nesbit's testimony about how the Petitioner came to possess the gun used during the killing, I agree with the majority's conclusion that Fred Nesbit's testimony "somewhat contradicted" the Petitioner's trial testimony that he took the gun from his uncle to prevent the police from finding it. The Petitioner would have needed to explain the contradiction in the Petitioner's taking the gun from Ashley Nesbit. I cannot conclude, though, that Fred Nesbit's testimony solely established that the Petitioner associated with a drug dealer who carried a gun. The evidence also established the reason for the Petitioner's possession of the gun. Fred Nesbit's testimony is circumstantial evidence of the inference that the Petitioner did not carry a gun routinely and of the inference that there was no premeditation in the victim's killing, which would have aided in the Petitioner's defense.

Trial counsel accepted Dr. Smith's conclusion that the victim was tortured without any independent evaluation or any discussion about whether independent review was necessary. Counsel interviewed Dr. Smith before the trial, knew of his conclusion that the victim was tortured, accepted his conclusions as fact, and knew that evidence would be presented at the trial that the victim was tortured because it was the State's basis for premeditation. Co-counsel testified that she and counsel never discussed if an independent expert were needed. Although counsel adamantly objected to the introduction of the satanic worship allegation at the trial, counsel knew of the allegation before the trial but took no action to prevent its introduction. I note that Mr. Massey's expert opinion was that addressing the issue of satanic worship pretrial would have been "appropriate and proper" because counsel knew of the allegation. Counsel admitted that Mr. Shaw's testimony about satanic worship was damaging, that he was not prepared to refute the allegation at the trial, and that evidence of the Petitioner's attending church regularly could have helped refute the allegation. Counsel acknowledged that the Petitioner's initial intake form showed that the Petitioner was a member of Christ Baptist Church but that he did not know if this was investigated.

Although Dr. Smith concluded to a reasonable degree of medical certainty that the victim was tortured, Dr. Hudson could not conclude that the victim was tortured to a reasonable degree of medical certainty and offered alternative explanations for the victim's wounds. Although the majority dismisses Dr. Hudson's testimony as evidence that he could not determine the cause of the victim's injuries, Dr. Hudson's testimony could have provided the jury with evidence of a reasonable possibility that the victim was not tortured. Dr. Hudson could not agree with Dr. Smith's findings to a reasonable degree of medical certainty and gave other possible causes that were "consistent with" the victim's injuries. Although Dr. Hudson was unable to determine the specific cause of the burns, he said the burns on the victim's neck, arm, and stomach were consistent with a burn from a curling iron and did not think an open flame caused the burn on the chin. Counsel failed to present any alternative explanation regarding the victim's injuries.

I note that although Ms. Geiser testified that Dr. Smith told her that one of the victim's children stated that the Petitioner burned their mother, I cannot conclude that the record supports a finding that such a statement was made. At the trial, Officer Wright testified that one of the victim's children said, "Red shot mama," a fact the Petitioner did not dispute at the trial. The record does not show that Dr. Smith testified at the trial that one of the children said the Petitioner burned their mother or that his autopsy records noted a police officer's telling him a child made the statement. The trial court's finding that the statement was presented to the jury is not supported by the record, and any reliance on this statement in denying the Petitioner's post-conviction relief was improper.

Counsel's lack of pretrial investigation and preparation leads me to question the

reliability of the verdict and conclude that the Petitioner was deprived of a fair trial and a reasonable chance of acquittal or a conviction for a lesser offense due to counsel's performance. *See Timothy Terell McKinney*, slip op. at 37. Although the trial court concluded that counsel's ineffective assistance required a new sentencing hearing, the evidence upon which it relied, in large part, related to the Petitioner's rebutting premeditation and establishing that the victim's death was the result of an accidental or reckless killing. I view the evidence to reflect more than a "residual doubt" normally associated with the issue of a sentence of death. *See State v. Hartman*, 42 S.W.3d 44, 55-56 (Tenn. 2001). This evidence is going to be used in a new sentencing hearing, but the issue of guilt should be revisited as well. I conclude that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the trial would have been different. *Strickland*, 466 U.S. at 694. The Petitioner was denied his constitutional right to the effective assistance of counsel, and I would reverse the judgment of the trial court, vacate the Petitioner's first degree murder conviction, and remand the case for a new trial.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

6