IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 5, 2021

## STATE OF TENNESSEE v. CHRISTOPHER WILLIAMS

**Appeal from the Criminal Court for Shelby County**
No. 19-00023          James M. Lammey, Judge
_____

### No. W2020-01258-CCA-R3-CD
_____

A Shelby County jury convicted the Defendant, Christopher Williams, of first degree premeditated murder and of being a felon in possession of a firearm. The trial court sentenced the Defendant to life imprisonment. On appeal, the Defendant asserts that the trial court erred when it admitted his confession into evidence and that the evidence was insufficient to support his convictions. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and ROBERT L. HOLLOWAY, JR., J., joined.

W. Price Rudolph (on appeal) and John Dolan (at trial), Memphis, Tennessee, for the appellant, Christopher Williams.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Amy P. Weirich, District Attorney General; Paul Hagerman and Jamie B. Kidd, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the murder of the victim, Anthony Beason, on a sidewalk outside a convenience store in South Memphis on September 3, 2016. The Defendant was later detained and, while in police custody, he made several statements. For the Defendant's role in the victim's death, a Shelby County grand jury indicted him for first degree premeditated murder and for being a felon in possession of a firearm.

### A. Trial

At the Defendant's trial, the parties presented the following evidence: Officer Benjamin Moore testified that he worked for the Memphis Police Department ("MPD") and responded to a call on September 3, 2016, for a "man down." When he arrived at the scene, he discovered the victim, shot, lying on the sidewalk. He found the victim, who had apparently been inside a nearby convenience store buying chips, holding the open chip bag. In the immediate area was a convenience store, liquor store, and several other businesses.

Martha Matthews, the victim's mother, testified that the thirty-nine-year-old victim lived with his family in the neighborhood where he had been shot and that he worked at UPS. The victim typically walked from his house to the nearby convenience store each night, which she stated he did the night of his death. Ms. Matthews saw the victim at her home earlier in the evening at approximately 7 p.m. The next morning, her daughter-in-law came to her home to tell her that the victim had been shot.

Victoria Robinson testified that she was the Defendant's girlfriend at the time of the victim's murder and that they had been dating approximately four months. Ms. Robinson was with the Defendant several days before the shooting and heard the Defendant tell his sister's boyfriend that he was going to "murder" the victim. Ms. Robinson explained that the victim was interested in the Defendant's sister, which angered the Defendant.

The day of the victim's murder, Ms. Robinson was visiting relatives out of state and video chatted with the Defendant. Ms. Robinson could see on the video that the Defendant was walking to the liquor store and following the victim. Ms. Robinson testified that she could not see the victim but that the Defendant told her what he was doing, saying, "I'm fixing to get [the victim]." She recalled seeing on the video the Defendant and Marquez Terry, a friend of the Defendant that she knew, following the victim as he walked back to his house. The Defendant hung up the video chat before the shooting. Later that day, he called Ms. Robinson back and told her "what all happened," saying that he had followed the victim, met up with him, and killed him. The Defendant said that he could see the victim eating a bag of chips and then the Defendant shot him. The Defendant told Ms. Robinson that someone had seen him shoot the victim, so the Defendant attempted to follow that person. After seeing the person had left the scene, the Defendant said he returned to where the victim was lying on the ground, moaning and asking for help, before the Defendant shot him again.

Ms. Robinson clarified that, right after the shooting, the Defendant video chatted her again as he walked to his sister's house. Ms. Robinson could see passing police cars responding to the scene of the shooting. The Defendant commented that he had already killed the victim and the police had passed him by. The Defendant said that he would call her back after he disposed of the clothes he wore during the shooting. The Defendant called her back later that night and explained "how everything happened." Ms. Robinson stated

that she had not spoken to the police about what the Defendant told her prior to trial because she was fearful. Ms. Robinson identified a photographic lineup in which she had identified the Defendant as

> the one [who] told me about [the victim], about how he killed him and shot him. He told me he was with [Marquez] Terry when they did it. He told me that he shot [the victim] one time and Terry shot three times. They told me that they took [the victim's] card. This murder happened September the 3rd, 2016.

Ms. Robinson testified that the Defendant told her multiple times during different conversations that he shot the victim. He also told her one time that Mr. Terry shot the victim.

On cross-examination, Ms. Robinson agreed that she had not witnessed the murder. Ms. Robinson agreed that she had been convicted of theft of property valued at over $1,000.

Eric Kelly testified that he was an MPD homicide investigator in 2016 and investigated the victim's murder. He responded to the scene of the shooting and found the victim lying partly on the sidewalk and partly in the street. He was neatly dressed and appeared to have just come from the convenience store because he was holding an open chip bag in his hand. Lieutenant Kelly identified two .380 caliber shell casings near the body. Surveillance footage from the nearby convenience store showed the victim buying chips from the store approximately twenty minutes before the call to 911 was made about the shooting.

Lieutenant Kelly continued his investigation in the following days and eventually was contacted by a family member of the victim. The family member had found "on the street" a "slide," which the lieutenant explained was a part of a gun, that was consistent with a .380 caliber weapon. The Defendant's and Ms. Robinson's name arose in conversations with a member of the victim's family, and Lieutenant Kelly investigated their relationship and eventually spoke with the Defendant, Ms. Robinson, and Mr. Terry.

Lieutenant Kelly recalled speaking with the Defendant twice, the first time on October 27, 2016 (hereinafter "Statement #1"). He had already interviewed Ms. Robinson and Mr. Terry at that point. The Defendant was advised of his *Miranda* rights and signed a waiver of rights form. The Defendant provided Statement #1 that day, the "gist" of it being that he was present at the victim's murder and saw what happened but claimed the shooter was Mr. Terry. The Defendant admitted to fleeing the scene. Lieutenant Kelly described the Defendant's demeanor as calm and "jovial" and said he seemed relieved to be giving a statement. He described the Defendant as "talkative." The Defendant indicated

that he understood his rights and wanted to make a statement. In Statement #1, the Defendant stated that he had seen Mr. Terry with a silver .380 caliber weapon. Lieutenant Kelly testified that he had not told the Defendant the caliber of the weapon at that point. The Defendant indicated that Mr. Terry dismantled the weapon after the shooting, throwing the barrel in the sewer, the clip on the roof of a building, and another part in a drainage ditch. The Defendant described what occurred that night:

> [The Defendant and Mr. Terry] were walking up the street towards the liquor store . . . , and [Mr. Terry] had a .380 on him. As we were talking, he seen (sic) [the victim], and [Mr. Terry] said this is the N word right here, ain't (sic) he? Then he kept walking, and I think [Mr. Terry] is going to punch him[.] As soon as we got close he pulled out the gun and shot him.

> [The victim] tried to grab [Mr. Terry], and he shot him again. [The victim] just fell. I stepped over the tall grass in the vacant lot. [Mr. Terry] was in the tall grass with me, and he was trying to unjam the gun. It [had] a bullet stuck in it or something. [The victim] was on the curb moaning and stuff. [Mr. Terry] got the gun unjammed and said, mane he seen (sic) us. I can't let the N man leave. He seen (sic) our face. We walked back over to him, and [Mr. Terry] bent down, put the gun to the back of his head and shot him.

The Defendant told Lieutenant Kelly that he had spoken with Ms. Robinson that evening via video chat. He stated that he later told Ms. Robinson that he had shot the victim but told Lieutenant Kelly that this statement was not true. The Defendant recalled that the victim was wearing orange and white at the time of the shooting. Lieutenant Kelly testified that the Defendant had identified Mr. Terry in a photographic lineup as the victim's shooter. He recalled that the Defendant told him that Mr. Terry put a part of the weapon in the ditch.

Lieutenant Kelly testified that the next day, the Defendant contacted him again indicating that he wanted to speak with the lieutenant. The Defendant gave a second statement ("Statement #2"), which was recorded. The recording was played aloud for the jury. Lieutenant Kelly testified about the Defendant's Statement #2, during which the Defendant commented that he did not like the colors associated with the Crips gang, which were orange and white, similar to the colors of the clothing worn by the victim that evening. Lieutenant Kelly asked the Defendant if he had any "beef" with the victim to which the Defendant replied that the victim had "played" the Defendant or his sister's boyfriend at some point. The Defendant stated that the victim had looked at him "crossways" or "mean mugged" him, which the Defendant took as a sign of disrespect. In Statement #2, the Defendant described seeing the victim the night of the murder, saying that he was

"stalking" the victim on his way to the store. The Defendant described waiting on a side street for the victim to come out of the store and then shooting the victim when he walked up. The Defendant described the victim moaning and said how the Defendant's gun jammed. The Defendant showed Lieutenant Kelly where he shot the victim, describing that he shot him "down low" on the back of the victim's head at his hairline.

Dr. Erica Curry testified that she served as a medical examiner and forensic pathologist in Memphis and conducted an autopsy of the victim's body. She observed gunshot wounds in his abdomen, upper back, and head. Dr. Curry stated that the cause of death was homicide.

The Defendant testified that he was present at the victim's murder but did not directly have anything to do with the murder. On cross-examination, the Defendant agreed that he had been convicted of aggravated assault in 2013 as well as possession of a firearm in 2015. The Defendant agreed that his was the voice on the recording of Statement #2 confessing to the victim's murder. He testified that Statement #1, during which he said he was present at the shooting but that it was perpetrated by Mr. Terry, was the truth about the victim's murder and that Mr. Terry should have been investigated. The Defendant testified that he confessed to the murder to Ms. Robinson because "she likes bad guy types." The Defendant denied writing threatening letters to Ms. Robinson from jail, including those with his name and booking number on them.

Upon hearing this evidence, the jury convicted the Defendant of first degree premeditated murder and illegal possession of a firearm. The trial court imposed a life sentence for the murder conviction and a concurrent sentence of seven years, two months, and twelve days for the felon in possession of a firearm conviction.[1] It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it allowed Statement #2 to be admitted into evidence because Statement #1, which was also admitted, was not recorded. He also asserts that the evidence is insufficient to support his convictions.

### A. Admission of Statements

The Defendant contends that the trial court erred when it admitted recorded Statement #2 into evidence, because Statement #1, which was not recorded, was also

---

[1] At sentencing, the Defendant pleaded guilty to three additional charges, not relevant to this appeal, and the trial court imposed concurrent sentences for those convictions.

admitted into evidence, making it a fundamentally unfair "piecemeal" introduction of evidence. By not recording Statement #1, he contends that the State deprived the jury of the ability to compare the two related statements. He contends that Statement #2 was admitted in violation of Tennessee Rule of Evidence 106, which compels the introduction of the entirety of a statement to prevent misleading the jury. The State responds that this issue is waived because the Defendant did not object to the admission of Statement #2 at trial. The State further responds that Tennessee Rule of Evidence 106, known as the rule of completeness, does not require the State to record one statement in order to introduce a different recorded statement.

Generally, appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). When a party does not object to the admissibility of evidence, the evidence becomes admissible, notwithstanding any other evidentiary rule to the contrary, and the jury may consider that evidence for its "natural probative effect as if it were in law admissible." *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981). The Defendant failed to object at trial to the admission of the statements, but he raised the issue in his motion for new trial. *See* Tenn. R. Crim. P. 30(b) ("Counsel's failure to object does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial.") We note that the trial court did not make specific findings related to this issue in its order denying the Defendant's motion for new trial.

As to the admission of the statements, Tennessee Rule of Evidence 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Tenn. R. Evid. 106. Our supreme court has stated that Rule 106 is "intended to ensure that the jury can assess related information without being misled by considering only portions of an item of evidence." *State v. Quintis McCaleb*, 582 S.W.3d 179, 187 (Tenn. Aug. 21, 2019) (citing *State v. Hartman*, 42 S.W.3d 44, 61 (Tenn. 2001)). Rule 106:

> reflects a concern for fairness and is designed to let the jury assess related information at the same time rather than piecemeal. This should help the jury avoid being misled by hearing only partial information about a writing or recorded statement. Moreover, it will assist the jury in assessing the weight to be given to the written or recorded statement by permitting the jury to consider at the same time other relevant writings and recordings.

Neil P. Cohen, et al., Tennessee Law of Evidence § 1.06[2][a] (6th ed. 2011) (footnotes omitted).

As the State points out, Rule 106 seeks to promote fairness in that it prevents the prosecution from introducing only a piecemeal portion of a defendant's statement, rather than the entire statement which would provide the overall context or the relevant exculpatory portions. *See State v. Keough*, 18 S.W.3d 175, 182 (Tenn. 2000). The Defendant contends that pursuant to Rule 106, the rule of completeness, the trial court should have excluded Statement #2, simply because it was recorded, whereas Statement #1 was not. Rule 106 has no such requirement and has no bearing on the admission of two separate pieces of evidence; it merely requires evidence be admitted in its entirety, which it was in this case. The Defendant is not entitled to relief.

## B. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions because there were no eyewitnesses to the shooting and no physical evidence linking the Defendant to the crime. He contends that his confessions were not truthful and that no reasonable jury could find that his statements were sufficient to sustain his convictions. The State responds that there was overwhelming evidence of the Defendant's guilt, particularly considering his two confessions and the corroborating testimony of Ms. Robinson. The State responds that the evidence is sufficient from which the jury could conclude that the Defendant intended to kill the victim and that he possessed a firearm. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn.

1958)).  "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence.  *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)).  "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact."  *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997).  "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'"  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)).  This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence.  *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant was convicted of premeditated murder, which requires proof of "premeditated and intentional killing of another person."  T.C.A. § 39-13-202(a)(1) (2016).  A premeditated killing is one "done after the exercise of reflection and judgment."  T.C.A. § 39-13-202(d) (2016).  Additionally, a person commits an offense who unlawfully possesses a firearm and, as here, has been convicted of a felony crime of violence.  *See* T.C.A. § 39-17-1307(b)(1)(A), (B)(2).

We conclude that the evidence, viewed in the light most favorable to the State, is sufficient for a rational trier of fact to conclude that the Defendant intended to shoot the victim after an exercise of reflection and judgment. The evidence showed, and the Defendant admitted to, following the victim as he walked to the store. This was after having some conflict with the victim over his perceived disrespect for the Defendant or someone connected to him or because of the victim's interest in the Defendant's sister. The Defendant walked behind the victim to the store and then waited on a side street for the victim to come out. After making a purchase from the store, the victim came out onto the street where the Defendant approached him and shot him three times; the third time he shot him in the back of the head. Before and after the shooting, the Defendant video chatted with his girlfriend and told her he was following the victim and later that he had shot him. The Defendant was a convicted felon when he committed this crime. This is sufficient evidence from which a jury could find beyond a reasonable doubt that the Defendant was guilty of first degree premeditated murder and being a felon in possession of a firearm. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE