IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 4, 2025

## STATE OF TENNESSEE v. MICHAEL LURRY

**Appeal from the Criminal Court for Shelby County**
**No. 23 00739 Carlyn L. Addison, Judge**

_____

### No. W2025-00074-CCA-R3-CD

_____

The Defendant, Michael Lurry, was charged by the Shelby County Grand Jury in a four-count indictment with first degree premeditated murder, theft of property valued at $60,000 or more but less than $250,000, attempted carjacking, and attempted theft of property valued at $2,500 or more but less than $10,000. The Defendant pled guilty to the attempted theft and theft counts of the indictment, the State nolle prosequied the attempted carjacking count, and the Defendant went to trial on the first degree murder count. Following his jury trial, the Defendant was convicted of the first degree premeditated murder count of the indictment. He was sentenced by the trial court to life imprisonment for the murder conviction, ten years for the theft conviction, and two years for the attempted theft conviction. Finding the Defendant to be an offender with an extensive criminal history, the trial court ordered that the Defendant serve all his sentences consecutively, for an effective sentence of life plus twelve years in the Tennessee Department of Correction. On appeal, the Defendant challenges the sufficiency of the evidence in support of his first degree premeditated murder conviction and argues that the trial court erred in admitting evidence of a prior domestic abuse incident between the Defendant and the victim, by not allowing the Defendant to introduce the victim's complete Cellebrite cell phone records, by sentencing the Defendant to the maximum and ordering consecutive sentences, and by admitting expert testimony that was outside the scope of the witness's expertise and when the Defendant was not put on notice of the witness's proposed areas of expertise. We affirm the Defendant's convictions but remand for a new sentencing hearing for the trial court to consider the Defendant's presentence report in determining whether the sentences should be served consecutively.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Vacated in Part; Case Remanded**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and STEVEN W. SWORD, JJ., joined.

Mitchell Wood, Memphis, Tennessee, for the appellant, Michael Lurry.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Monica Timmerman and Alicia Walton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

At 5:24:27 a.m. on August 3, 2022, Toneshia Hardeman, who had been involved in a romantic relationship with the Defendant, attempted to make a 911 call on her cell phone. Later that morning, she was found lying in a pool of blood in the parking lot of a tire shop in the Frayser neighborhood of Memphis, with her purse, her cell phone, and a piece of fender from her Chevrolet HHR on the ground near her body. She died after being transported to a hospital. The medical examiner who performed the autopsy of her body determined that the cause of death was blunt force trauma consistent with being hit by a vehicle. Surveillance video from a service station across the street showed a vehicle, at 5:23 a.m., approaching the area where the victim's body was found, circling around, and driving over the same area again at 5:24:29 a.m.

The victim's Chevrolet HHR was located the next day on private property in a different area of the city. Surveillance video showed the Defendant parking the vehicle at 5:55 a.m. on August 3, 2022, exiting, and walking away. Within an hour, the Defendant attempted to steal a van and trailer from a man who was putting air in one of his trailer tires. Unsuccessful, the Defendant went down the street and, at 6:45 a.m., stole a tractor trailer from a man who was unloading goods into a restaurant. The Defendant drove that tractor trailer around the city, setting the rear of the trailer on fire by his failure to disengage the air brakes, until he eventually abandoned it and ran off.

The Shelby County Grand Jury returned a four-count indictment that charged the Defendant in count one with the first degree premeditated murder of the victim, in count two with theft of property valued at $60,000 or more but less than $250,000, in count three with attempted carjacking, and in count four with attempted theft of property valued at $2,500 or more but less than $10,000.

- 2 -

On August 26, 2024, just before the start of his jury trial on the murder count of the indictment, the Defendant entered open guilty pleas to counts two and four of the indictment, with the prosecutor reciting the following factual basis for the pleas:

[The Defendant] is pleading open to this Court to counts two and four of the indictment.

The State is going to nol-pros at no cost count three. Counts three and four were alternate theories.

Had . . . those matters gone to trial and part of these facts will still be presented at trial because they do link him to count one. The State's proof would have shown that on August 3, 2022, [the Defendant] for count two did take from Derrick Hands a semi tractor trailer with a value between 60 and $250,000 without permission to have that vehicle and . . . took that vehicle, drove it around Memphis before ultimately abandoning it somewhere around Kiser Wood Flooring.

As to count four, State's proof would have shown that on that same day August 3, 2022, [the Defendant] took from Martin Hayes or attempted to take from Martin Hayes a white van with a trailer as Mr. Hayes was putting air in his tire near The Brown Jug Liquor store and Mr. Hayes was successfully able to fight [the Defendant] off, at which time [the Defendant] left the scene and proceeded up the street to take the tractor trailer from Mr. Hands in count two.

The trial court voir dired the Defendant, found that the pleas were knowing and voluntary, and accepted the guilty pleas.

The State's first witness at the Defendant's murder trial was the victim's mother, Thernice Herndon, who testified that the victim had three children: Joseph Hardeman, R. H., and T. T.[1] On cross-examination, she testified that T.T.'s father was Stretravious Turner. She did not know if the victim and Mr. Turner were dating at the time of the victim's death.

Sixteen-year-old R. H., the victim's older daughter, testified that she last saw the victim on the night of August 2, 2022, as the victim was walking out the door. She asked the victim where she was going, but the victim would not tell her. A couple of minutes later, the victim called R.H. asking for "her Id and stuff." R.H. could not hear anyone in

---

[1] To help protect the privacy of the victim's minor children, we refer to them by their initials.

the background of the telephone call and did not know whether the victim was alone or with someone.

R.H. related the following account of events that transpired on the night of April 17, 2021, when she was at her aunt's house with her aunt and her two cousins. She testified that she was in the living room when the screaming victim ran up to the front door. She stated that she opened the door to let the victim inside and went to get her aunt from the back of the house. When she returned, the victim and the Defendant were in the dining room fighting. During that time, the Defendant knocked R.H. to the floor, but she did not believe it was intentional. R.H. testified that the victim appeared "scared for her life." She said she saw the Defendant choking the victim when the victim was outside, and that the victim was trying to get away from the Defendant. She stated that someone in the house called the police. On cross-examination, R.H. testified that the Defendant choked the victim in the front yard before the victim ran into the house.

Memphis Police Department ("MPD") Officer Michael G. Mejia, who responded with his field training officer to the April 17, 2021 domestic disturbance call involving the victim, identified his body camera video recording, which was admitted as an exhibit and published to the jury. He testified that the victim, who was at a different location from her home, told him that the Defendant had assaulted her and was trying to kill her, appeared to be in a panic, and expressed concern that the Defendant might be waiting for her in her home. He identified the photographs he took of the victim's injuries, which included a laceration on her nose, a split lip, two knots on the side of her head, cuts on her hand, and chipped teeth. He stated that he went to the victim's home and searched everywhere, including the attic, to be sure that the Defendant was not there. On cross-examination, he testified that the Defendant was not at the victim's home and was not arrested that day.

The victim's friend, Raven Carter, testified that she and the victim had plans on or about August 3, 2022, to go to Atlanta, Georgia on a "girls trip/new beginning" celebration for the victim, who had recently broken off her romantic relationship with the Defendant. She said the victim and the Defendant began dating in the early half of 2020. In the beginning, the victim and the Defendant's relationship was very good, with the victim thinking that she and the Defendant would marry. However, the relationship quickly "turned very bad" with the Defendant exhibiting intense jealousy of the victim's male cousins and male friends. Ms. Carter testified that the victim was not dating any other men during the time she dated the Defendant. She said the victim had a "pretty good relationship" with Mr. Turner regarding their shared parenting of the victim's younger daughter.

On cross-examination, Ms. Carter recalled having once been with the victim in a store when the victim became visibly distressed. Ms. Carter stated that she followed the

victim's gaze to see the Defendant walking into the store, and that the victim asked how the Defendant knew the victim was at that store.

When asked if she was aware of Mr. Turner's having been jealous and upset that the victim would not respond to his text messages, Ms. Carter replied that Mr. Turner was too childish for the victim. She did not believe the victim would respond to text messages from Mr. Turner and said that when Mr. Turner failed to receive a response from the victim, he would text Ms. Carter.

When asked on redirect examination if she had ever known Mr. Turner to harm the victim, she replied: "No. [Mr. Turner] couldn't blow a bubble with Bubbilicious bubble gum. No, unh-unh."

MPD Officer Denzel Flenorl, who responded at approximately 6:19 a.m. on August 3, 2022, to an accident call in the parking lot of Russell Tire on Mountain Terrace in Frayser, identified still photographs from his body camera video recording that showed a red purse, a cell phone, a small part of a fender, blood and engine fluid in the parking lot and a vehicle's fender in the road outside the tire shop. He testified that while he was still on the scene, he encountered the victim's son, who was trying to locate the victim's cell phone.

MPD Lieutenant Jimmy Rinehart testified that he was able to determine from a part number on the larger piece of fender that it came from a Chevrolet HHR, which he later learned belonged to the victim.

Leslie Harwell, who lived next door to Russell Tire, identified still photographs from her home's surveillance video recorded on the morning of June 3, 2022, that showed an individual walking down the street toward Russell Tire. On cross-examination, she testified that she did not hear anything that morning and that her surveillance cameras did not record the type of vehicle or the person driving the vehicle.

Mohammad Arrafat, an employee of EZ Mart, a service station across the street from Russell Tire, identified two surveillance videos he provided to the police. The first showed Russell Tire's parking lot at the time of the incident and the second, recorded on April 3, 2024, was a daytime view of the same scene. Mr. Arrafat agreed that the August 3, 2022 video recording showed the headlights of a vehicle pulling off, coming "back through the drive," turning around, and "driving back off and then out of the frame." On cross-examination, he testified that he could not determine if it was the same set of headlights each time.

MPD Lieutenant Byron Haynes, who was assigned to investigate the victim's death, identified the two surveillance videos he collected from EZ Mart, as well as an enhanced version of the August 3, 2022 video. As the enhanced video was being played, Lieutenant Haynes pointed out where the vehicle went around, came back toward the camera, and "move[d] up a little bit." In his opinion, the vehicle moved up in that location "[b]ecause it was running over something."

Lieutenant Haynes testified that the victim's Chevrolet HHR was located the next day after the owner of a building at Chelsea and McLean called the police to report it parked on his property. Surveillance video from a "Real Time Crime Center" or "Sky Cop" camera recorded the vehicle pulling into the property at 5:55 a.m. on August 3, 2020, and a man dressed in a hoodie and distinctive acid-washed pants, identified as the Defendant, exiting the vehicle and walking toward the camera.

A short time later, a man called the police to report that someone had attempted to steal his van on Summer Avenue. A few minutes after that, a man delivering food to a Summer Avenue Dixie Queen had his tractor trailer stolen. Lieutenant Haynes testified that both of those calls originally went to different investigators because the calls originated in different precincts. However, while Lieutenant Haynes was at the hospital, he learned from the victim's family members that a live Facebook video had been posted of the Defendant driving the stolen tractor trailer, which had cameras that recorded both the outside of the tractor trailer and the inside of the cab.

Lieutenant Haynes testified that the driver of the tractor trailer was in "the back . . . delivering his food stuff or whatever" when the Defendant walked up, hopped in the cab, and drove off. The time stamp at the beginning of the dash camera video was 6:45:45 a.m. As the video was played, Lieutenant Haynes identified landmarks the Defendant passed as he drove the tractor trailer through Memphis before finally coming to a stop on Walnut Grove Road, where he exited the cab and ran off. Lieutenant Haynes stated that it was obvious that the Defendant did not know how to disengage the tractor trailer's air brakes. At some point during the Defendant's drive through the city in the tractor trailer, a fire department SUV began following the Defendant attempting to pull him over because the over-heated air brakes had caught the trailer on fire.

On cross-examination, Lieutenant Haynes testified that he could not determine from the EZ Mart video the type of vehicle, or whether it was "the same set of headlights both times." He testified that there were several different routes from Russell Tire to Chelsea and McLean. He had not traced the most direct route to determine how long it would take. However, he assumed the Defendant did not drive there directly because it would not have taken thirty minutes. He was unable to say how many people were in the vehicle at 5:34:29 a.m. on August 3, 2022. The vehicle did not pass any license plate reader cameras from

the time it left the tire shop until the Sky Cop camera recorded it being parked at Chelsea and McLean. The police department received some anonymous Crime Stoppers tips about the crime, but none were legitimate.

On redirect examination, Lieutenant Haynes agreed that the fastest route from the tire shop to Chelsea and Mclean would take approximately eight minutes but that if someone was searching for a place "to dump a vehicle," it could take longer. On re-cross examination, he acknowledged that the drive could also take longer if "people were getting out of the vehicle at different points." On further redirect examination, he testified that he had no indication that anyone other than the Defendant was driving the vehicle, or that the victim was with anyone other than the Defendant. On further re-cross examination, he testified that the Defendant was his only suspect: "If there was anybody else who . . . seemed to be a possible suspect as far as being involved with this in any way, I would have looked into them. I would have researched them, and I would have found them."

Dr. Juliette Scantlebury, the assistant medical examiner who performed the autopsy of the victim's body, described the victim's multiple injuries, which included: blunt head trauma with a skull fracture and subdural hematoma; blunt pelvic trauma with a fracture in the pubic symphysis; blunt trauma of the torso, with abrasions, a laceration, and a fractured rib; and a fractured right femur. She determined that the cause of death was blunt trauma of the head and pelvis consistent with being hit by a vehicle, and that the manner of death was homicide.

Martin Hayes testified that he was inflating his trailer tires at a service station at Hollywood and Summer Avenue at 6:30 a.m. on August 3, 2022, when a man tried to steal his vehicle.

MPD Detective Kharyssa Pye, an expert in Cellebrite examination in digital forensics, identified a portion of the Cellebrite report of data extracted from the victim's cell phone, which was admitted as an exhibit and published to the jury. She testified that the call log reflected that a number listed in the victim's cell phone as belonging to Temeka Lurry called the victim at 12:44:49 a.m. on August 3, 2022. The call was answered and lasted for two minutes and forty-two seconds. At 5:24:27 a.m. on August 3, 2022, the victim's cell phone attempted to call 911. The call was not answered. A call could be listed as "[n]ot answered" on a Cellebrite extraction report for several different reasons, including if the cell phone's battery died before the call was answered or if the call did not connect. On cross-examination, she acknowledged that the number listed in the victim's cell phone as Temeka Lurry's "could actually be anybody's number"; the name did not come from any phone company record. She testified that, if there were text messages on the victim's cell phone, they would be reflected in the full Cellebrite report.

Tracey Fields, a criminal investigator with the Shelby County District Attorney's Office, testified that she was assigned to investigate the relationship between the Defendant and Temeka Lurry. She said she found Temeka Lurry's name in a police report in which her emergency contact was listed as Gloria Lurry, googled Gloria Lurry's name, and found an obituary for Gloria Lurry that listed the Defendant and Temeka Lurry as two of Gloria Lurry's children. On cross-examination, she testified that she never reached out to Temeka Lurry to find out if the Defendant was her brother or if the Defendant had her cell phone.

MPD Officer Jackson Ngien, the crime scene investigator who processed the victim's Chevrolet HHR, identified photographs of the vehicle that showed, among other things, two indentations on the hood, a "large caved in damaged area on the driver's side of the windshield" with what appeared to be "small fragments" of human tissue inside, the right front wheel with "possible blood transfer and a scuff mark," the front right fender well that was missing its fender well liner, and possible blood transfer on the front and rear passenger doors. He testified that they tested a small sample of one of the areas of possible blood transfer, and that it tested positive for blood, but he did not know whether it was human or animal blood. He also collected DNA swabs from the vehicle, which were sent to the Tennessee Bureau of Investigation for analysis.

The parties stipulated that the blood from the victim's Chevrolet HHR matched the victim's DNA profile and that "the DNA profile obtained from the steering wheel and the shifter," which contained "a mixture of [DNA from] at least three individuals, including one male," "was too complex and was inconclusive for comparison purposes."

MPD Sergeant William Porter, a 50-year veteran of the MPD with 38 years in the Special Traffic Investigation Unit, who was accepted by the trial court as an expert in the field of crash investigations, testified that he prepared a report on the crash of the victim's vehicle after being asked by the investigator to give his opinion. To form his opinion, he reviewed the data downloaded from the vehicle's "black box" and reviewed photographs of the scene and of the vehicle. He explained that much of the data from a black box consists of whether the "module" or "event data recorder, recorded an event." He stated that there are two kinds of events that can be recorded: "a non-deployment event" in which the air bags do not deploy and a "deployment event" in which the air bags deploy. He said that the event data recorder in a vehicle is always in "idle mode" until an event, such as a rapid slowdown or rapid acceleration, causes the module to "wake up and see what's going on." An example of a non-deployment event would be when a driver traveling down a road slams on the brakes when something jumps in front of the vehicle, which would cause the driver's seatbelt to tighten but would not cause the air bags to deploy. In the case of the victim's vehicle, "[t]he module did not read an event at all" as "there is not enough mass on a human body to slow a vehicle down that much where . . . the module can read the event."

In his opinion, the two circular dents on the hood of the victim's vehicle were caused by the victim's having instinctively put her hands forward "to try to embrace the impact of the vehicle." He opined that the shatter damage to the windshield was caused by the victim's head striking the windshield. Because the damage was near the base of the windshield, his opinion was that the vehicle was traveling approximately thirty miles per hour when it struck the victim. He based that opinion on having attended courses from the two main traffic investigation schools, which had researched and compiled data on the different positions of a "first head strike" and the corresponding speeds at which a vehicle was traveling to cause those head strikes. Illustrating his testimony with a photograph, Sergeant Porter testified that, according to the guidelines, a first head strike that begins anywhere "from the base of the windshield all the way up to roughly about right here on the windshield" meant that the vehicle was traveling between 30 and 40 miles per hour.

On cross-examination, Sergeant Porter testified that he did not go to the crash scene or view the vehicle in person, and that the investigator never asked him to do so.

The victim's son, Joseph Hardeman, testified that the victim picked him up in her Chevrolet HHR from Walmart, his workplace, at approximately 10:00 p.m. on August 2, 2022. After dropping the victim at home, he left in the victim's vehicle to get something to eat but returned home when the victim texted that she needed the vehicle. The victim left at approximately 12:15 a.m. without telling him where she was going. At the time she left, the vehicle had only minimal cosmetic damage; the two dents in the hood and the crack in the windshield did not exist. Mr. Hardeman testified that he became increasingly worried the next morning when the victim failed to return home. Recalling that he had access to the victim's location through her cell phone, he walked to Russell Tire, where he learned what had happened.

On cross-examination, Mr. Hardeman testified that the Defendant and the victim were in an "on period" of their relationship on August 3, 2022, and that the victim had mentioned wanting to marry the Defendant.

The Defendant elected not to testify and did not present any evidence in his defense. Following deliberations, the jury convicted him of first degree premeditated murder as charged in the indictment, for which he was sentenced to life imprisonment. Finding several enhancement factors applicable and no applicable mitigating factors, the trial court subsequently sentenced the Defendant as a Range I offender to ten years for the theft conviction and two years for the attempted theft conviction. Based on its finding that the Defendant was an offender whose record of criminal activity was extensive, the trial court ordered the Defendant to serve his ten-year sentence consecutively to his life sentence and his two-year sentence consecutively to both the ten-year sentence and the life sentence, for

an effective sentence of life plus twelve years. Following the denial of his motion for new trial, the Defendant filed a timely notice of appeal to this court.

## ANALYSIS

### I. Prior Domestic Abuse Incident[2]

The Defendant contends that the trial court abused its discretion in admitting evidence of the 2021 domestic abuse incident with the victim, arguing that "[a] solitary incident occurring 18 months prior where no arrest was made or probable cause found creates a circumstance that is too attenuated and too unlikely to establish a continued intent to harm." Citing the victim's son's testimony that the victim and the Defendant were in an "on again" phase of their relationship at the time of the victim's death, and the lack of proof of any recent argument between the victim and the Defendant, the Defendant asserts that the 2021 incident lacked any probative value and was unfairly prejudicial because it suggested that the Defendant is a violent person. The State argues that the trial court properly exercised its discretion in admitting the evidence. We agree with the State.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Such evidence may, however, be admitted for other purposes if the following conditions are met prior to admission of this type of proof:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). "Other purposes" include the defendant's motive, intent, guilty knowledge, identity, absence of mistake or accident, a common scheme or plan, completion

---

[2] We have reordered the Defendant's issues.

- 10 -

of the story, opportunity, and preparation. *See State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004).

If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005) (citations omitted).

In its pretrial motion, the State argued that the 2021 domestic abuse incident was relevant to show motive, intent, absence of mistake and settled purpose to harm. At the hearing on the motion, Officer Mejia identified his body camera video, which was admitted as an exhibit to the hearing. Officer Mejia's pretrial hearing testimony mirrored his trial testimony, with additional information that the victim told him that the Defendant had assaulted both herself and her twelve-year-old daughter. Officer Mejia was unable to recall if he spoke with the daughter and acknowledged that he did not witness the incident or locate the Defendant.

The State informed the trial court that the victim's daughter was hospitalized due to anxiety but had witnessed the April 17, 2021 assault and would be called as a trial witness. At the conclusion of the hearing, the trial court found that evidence of the prior domestic abuse incident was admissible as proof of motive and that its probative value was not outweighed by the danger of unfair prejudice. Implicit in the trial court's ruling was a finding that proof of the 2021 incident was clear and convincing.

"Tennessee courts have recognized a line of cases that stand for the proposition that violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show [the] defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *State v. Jarman*, 604 S.W.3d 24, 49 (Tenn. 2020) (citations and internal quotations omitted). Even though there was only one prior incident of abuse offered by the State, that is enough for the court to find the incident admissible if all the 404 (b) factors are met. *Id.* at 50 (concluding that it is not "necessary or wise to draw an arbitrary line regarding how many instances of prior violence in a relationship are necessary before the evidence becomes relevant to show the defendant's animosity toward or intent to harm the victim" but that it is instead a question for the trial court to determine when analyzing the 404 (b) factors).

We agree with the State that evidence of the 2021 domestic assault was relevant to show not only the Defendant's motive, but also intent and absence of mistake or accident. We further agree that, given the lack of similarities between the two incidents, the probative value of the 2021 domestic assault incident on the issues of motive, intent, and absence of mistake or accident outweighed the danger of unfair prejudice. We conclude that the trial court acted within its discretion in admitting the evidence.

- 11 -

## II. Excluded Text Messages in Cellebrite Report

Prior to Detective Pye's trial testimony, the Defendant sought a ruling from the trial court on whether he would be allowed to introduce a series of text messages sent to the victim, presumably from Mr. Turner, in the weeks leading up to and including the day of the victim's death. According to defense counsel's summary of their content, the text messages were expressions of Mr. Turner's unrequited love for the victim. Defense counsel asserted that the text messages showed the nature of the couple's relationship and conveyed Mr. Turner's "tone of anger," thereby providing the state of mind and possible motive of an alternate suspect in the case. The State asserted that it was impossible to read tone from a text message and argued that the text messages were irrelevant, would confuse the jury, and were inadmissible hearsay. The State pointed out that Mr. Turner was not clearly identified as the author and was not present to be cross-examined. Defense counsel countered that it did not matter if Mr. Turner was the author but only that the text messages showed that the victim was "having a dispute" with someone. After listening to the parties' respective arguments, the trial court denied the Defendant's request on the basis that the evidence he sought to introduce was too speculative.

On appeal, the Defendant contends that his "inability to produce the remaining portion of Cellebrite phone records" "robbed [him] of the ability to present the defense of an alternate suspect as well as violated the rule of completion" under Tennessee Rule of Evidence 106. The State argues that the Defendant has waived his rule of completeness claim by his failure to raise it before the trial court, that this court should decline to conduct plain error review because the Defendant does not acknowledge the waiver or request plain error review, and that the Defendant cannot show he is entitled to plain error relief on his rule of completeness claim because, among other things, the text messages were unrelated to the portion of the Cellebrite report introduced by the State.

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). An abuse of discretion occurs "when the court applied an incorrect legal standard, reached an illogical conclusion, or based its decision on a clearly erroneous assessment of the evidence or employs reasoning that causes an injustice to the party complaining." *State v. Davidson*, 509 S.W.3d 156, 207 (Tenn. 2016) (citation omitted).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 106, often referred to as the rule of completeness, provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Rule 106 is "intended to ensure that the jury can assess related information without being misled by considering only portions of an item of evidence." *State v. McCaleb*, 582 S.W.3d 179, 187 (Tenn. 2019) (citing *State v. Hartman*, 42 S.W.3d 44, 61 (Tenn. 2001)).

We note that the excluded text messages are not included in the appellate record and were not provided to the trial court. At trial, defense counsel summarized what the messages said, informing the trial court that he had intended to bring a copy of that portion of the more than 3000-page Cellebrite report to court but had learned from his office staff that his printer was out of toner. The prosecutor, while not disputing defense counsel's summary of the text messages, pointed out that they were one-sided, with the victim only occasionally replying with mostly one-word answers.

Although defense counsel referred to his summary of the text messages as an offer of proof, he did not have the excluded text messages admitted for identification purposes at trial. Even if he did not have access to printer toner at the time of the trial court's ruling, nothing would have prevented him from seeking to have the text messages admitted for identification purposes at a later point in trial after his printer issue was resolved. "In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner. When it is a document or exhibit, this is done simply by having the exhibit marked for identification only and not otherwise introduced." *State v. Goad*, 707 S.W.2d 846, 852-53 (Tenn. 1986). Given the Defendant's failure to include the challenged text messages in the record on appeal, we conclude that this issue is waived.

### III. Admission of Expert Testimony

The Defendant contends that the trial court improperly admitted Sergeant Porter's expert testimony "regarding the speed of the vehicle and the windshield spidering analysis" because the State failed to put the Defendant on notice that it intended to call Sergeant Porter as an expert witness, and because Sergeant Porter did not provide a report on his "windshield spidering analysis." The Defendant asserts that his failure to have proper notice of the State's intention to call Sergeant Porter "as an accident reconstructionist to establish the speed of the vehicle or the findings related to the spidering [of] the

windshield" deprived him of the opportunity to consult with defense experts on the topic, thereby "violating the fundamental fairness of a defendant to produce a defense." The State argues, among other things, that the Defendant has waived the issue for failure to include it in his motion for new trial and that this court should decline to conduct plain error review because the Defendant failed to acknowledge the waiver or request plain error review.

We agree that the Defendant has waived plenary appellate review of this issue by his failure to raise it in his motion for new trial. *See* Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"). Moreover, because the Defendant did not acknowledge his failure to raise the issue in the motion for new trial and does not request plain error review, we decline to address this issue as plain error. *See State v. Nelson*, 275 S.W.3d 851, 864 (Tenn. Crim. App. 2008) ("Appellate courts are advised to use plain error sparingly in recognizing errors that have not been raised by the parties or have been waived due to a procedural default.") (citing *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007)).

## IV. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his first degree premeditated murder conviction, arguing that the State failed to prove beyond a reasonable doubt that he acted with premeditation and without the heat of passion. In support, he cites the victim's son's testimony that the status of the victim's relationship with the Defendant was "on again" at the time of the killing. The Defendant asserts that there was no evidence of "any ongoing hostility" toward the victim, and that "[t]he only logical conclusion . . . is that something happened that morning . . . that caused [the Defendant] to act the way he did; something sent him into a rage." The State asserts that there is "zero evidence in the record to suggest [that the Defendant acted in] a state of passion" and that the evidence, which showed that the Defendant ran over the victim at thirty miles an hour and then swung the car around to run over her again, was more than sufficient to establish premeditation. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v.*

*Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Reynolds*, 635 S.W.3d 893, 914 (Tenn. 2021) (citation omitted). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620,623 (Tenn. Crim. App. 1987). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

First degree premeditated murder is defined as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* at § 39-11-302(a). "Premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(e). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *Reynolds*, 635 S.W.3d at 916 (citations omitted).

Our supreme court has provided a non-exclusive list of circumstances from which a jury may infer premeditation, which includes the defendant's use of a deadly weapon on an unarmed victim, the infliction of multiple wounds or repeated blows, the defendant's destruction or secretion of evidence after the killing, the defendant's calmness after the

- 15 -

killing, evidence of a motive for the killing, lack of provocation by the victim, evidence that the victim was retreating or attempting to escape when killed, and the failure to render aid to the victim. *Id.* (citations omitted). A vehicle may be used as a deadly weapon. *See State v. Alvey*, No. E2020-00273-CCA-R3-CD, 2021 WL 1944393, at *5 (Tenn. Crim. App. May 14, 2021).

Viewed in the light most favorable to the State, the evidence establishes that the unarmed victim, who had recently ended her romantic relationship with the Defendant, attempted to call 911 as the Defendant drove toward her in her vehicle. Rather than calling for help or attempting to render aid to the victim, the Defendant circled around and ran over the victim again, inflicting multiple injuries, before driving off to dump the vehicle in a different area of the city. This was sufficient evidence by which a jury could infer that the Defendant acted with premeditation. Accordingly, we affirm the conviction for first degree premeditated murder.

## V. Sentencing

The Defendant lists the following regarding his challenge to his sentence in his statement of issues: "The Court failed to give any consideration to the mitigating factors presented in the case by sentencing [the Defendant] to the maximum, consecutive sentence." The record, however, reflects that the Defendant failed to propose or argue any mitigating factors at sentencing. Moreover, the argument section of the Defendant's brief consists of only three sentences in which the Defendant's sole argument is that the trial court erred by basing consecutive sentencing on the Defendant's extensive criminal history when there was no proof in the record other than the prosecutor's "statement that the [the Defendant] had previously been convicted [of] two prior felonies."

This court reviews a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012). The abuse of discretion with a presumption of reasonableness standard is applied to decisions regarding the length, range and manner of service of a sentence, including the trial court's decision regarding consecutive sentencing "so long as [the sentence] is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10; *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (applying deferential *Bise* standard of review to consecutive sentencing decisions).

In determining a defendant's sentence, the trial court is required to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing

alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Defendant in his own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

The State argues that the Defendant's failure to provide any citations to the record or to legal authority should result in the waiver of his sentencing issue. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Although we agree that the Defendant's briefing on sentencing is inadequate, we disagree that his challenge to his sentences is, thereby, waived. Among the factors the trial court was required to consider in imposing the sentences was the presentence report, including the results of the validated risks and needs assessment contained in the presentence report. The record contains an order for a presentence report that was signed by the trial court on August 27, 2024. However, there is no presentence report in the appellate record, and neither the parties nor the trial court mentioned the presentence report at the sentencing hearing.

We also note that the trial court's statements on the Defendant's criminal history are contradictory, with the trial court at one point mentioning that the Defendant's criminal history was "for the most part unremarkable" before later finding that the Defendant qualified as an offender whose record of criminal activity was extensive because "his record [went] back to 2005." We further note that the trial court's decision to order consecutive sentences appears, in part, to be erroneously based on a desire to avoid depreciating the seriousness of the theft and attempted theft offenses, which is a valid factor to consider when ordering a sentence of confinement, but not for ordering consecutive sentences. Additionally, the trial court's written sentencing findings of fact, on which the sentences are listed as concurrent, contradicts the trial court's oral ruling. Without the presentence report in the appellate record, we are precluded from conducting a de novo review to determine if the trial court's order of consecutive sentences is supported by the record. We, therefore, affirm the Defendant's convictions but remand for a new sentencing hearing for the trial court to properly consider the Defendant's presentence report in determining the manner of service of the sentences.

## CONCLUSION

Based on our review, we affirm the Defendant's convictions but remand to the trial court for further proceedings consistent with his opinion.

S/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE